## MAXWELL *v.* STATE OF INDIANA.

[No. 769S153. Filed August 4, 1970. Rehearing denied October 13, 1970.]

*Frank P. Huse, Jr.* and *Frederick J. Graf,* of counsel, of Indianapolis, for appellant.

*Theodore L. Sendak,* Attorney General, *Robert F. Hassett,* Deputy Attorney General, for appellee.

DeBruler, J.—This is an appeal from a conviction of First Degree Murder returned by jury in the Marion County Criminal Court, Division 2. The facts which tend to support the verdict are these:

At 4:00 p.m. on Sunday, September 17, 1967, the victim, Rainey Hughes, went to a Gulf Service Station at 3750 E. Prospect Street owned by appellant. Appellant, Snowden Hughes, the son of Rainey, and John Robbins were working on the premises at the time.

There was animosity between appellant and Rainey Hughes because Rainey's wife was divorcing him to marry appellant. On Thursday, September 14, 1967, Mrs. Hughes and her daughter Mary Balay taked to appellant at his service station at which time he said he would shoot Rainey Hughes if Rainey came up on his drive again.

However, when Rainey arrived Sunday appellant asked Rainey if he wanted a drink and appellant left to obtain some bootleg whiskey. Appellant and Rainey drank together for several hours in an apparently friendly atmosphere. They talked about shooting each other in what one witness described as a joking manner and around 7:00 p.m. they used appellant's pistol to shoot at an oil can in back of the station.

At about this time appellant and Rainey were definitely both under the influence of the whiskey and Rainey said that he was sleepy and intended to go to his home five blocks away. Rainey's wife had a restraining order against Rainey, but apparently he had been living there anyway. Appellant did not want Rainey to go home because Mrs. Hughes did not want him there. Appellant said he would go there and see if it was okay for Rainey to come home. Appellant drove off and came back in a few minutes and said Mrs. Hughes did not want Rainey there and would have him arrested if he showed up.

Rainey insisted he was going and appellant insisted he was not. The record does not indicate exactly how long the argument lasted but the two men ended up outside of the station between two cars parked side by side, an unknown distance apart. At this point appellant shot Rainey Hughes in the chest with one shot from appellant's pistol. There was no struggle and Rainey Hughes was not armed.

After he was shot, Rainey walked towards his son, Snowden, said "He shot me", and fell to the ground. John Robbins who had heard the shot and heard Rainey say that to his son and collapse, went to the office to call the police. Appellant, with the gun still in his hand, entered the office and told Robbins to go ahead and call the police. Appellant then drove away in his car. He returned in forty-five minutes to one hour, gave the gun to the police, and said "It was an accident."

A.    Appellant's first allegation of error is that there is insufficient evidence to show that appellant "purposely and with premeditated malice" shot Rainey Hughes. In reviewing this allegation this Court will not weigh the evidence nor resolve questions of credibility, but will look to that evidence and the reasonable inferences therefrom which support the verdict of the trial court. The conviction will be affirmed if from that viewpoint there is evidence of probative value from which a reasonable trier of fact could infer that the appellant was guilty beyond a reasonable doubt. *Glover* v. *State* (1970), 253 Ind. 536, 255 N. E. 2d 657.

The statute under which appellant was charged says:

"Whoever purposely and with premeditated malice . . . kills any human being is guilty of murder in the first degree, and on conviction shall suffer death or be imprisoned in the state prison during life." Acts 1941, ch. 148, § 1, the same being Burns § 10-3401.

There was sufficient evidence of purpose in this case. Appellant, without struggle, pointed a gun at an unarmed man's

chest and shot him. Appellant is assumed to have intended the natural and probable consequence of his act. *Brown* v. *State* (1969), 252 Ind. 161, 247 N. E. 2d 76. We can think of no clearer example of what it means to "purposely" shoot another person, than the facts in this case.

Malice could properly have been inferred from the intentional use of a deadly weapon in a manner calculated to cause death. *Yarber* v. *State* (1962), 242 Ind. 616, 179 N. E. 2d 882; *Miller* v. *State* (1962), 242 Ind. 678, 181 N. E. 2d 633.

There was also sufficient evidence of premeditation by appellant. There was only one eye-witness to the actual shooting, a young man named Robert Mann. He was standing outside the station near the service bays, with a friend of his named Floyd Whitlock. Concerning the shooting, the witness testified:

"A. Tell what happended—well, I was standing near the machine, you know, talking to Floyd. Anyway, the defendant and Hughes was walking, you know, and they were arguing, they was. Well, I didn't pay no attention to them, you know, they was arguing, pretty high, they was. Then they walked out on the ramp over to near two cars, they was. They was talking, and so I kept on talking to Floyd. And me and Floyd was looking at them, then we turned around and started talking again. So then when I turned around the next time, the defendant, you know, had a gun on Hughes. So I was still talking to Floyd, and then when I turned around again, that's when the gun went off.

Q. And did you say the defendant had a gun on Hughes? How do you mean, he had a gun on him?

A. He had it pointed at him.

Q. Pointed at him?

A. Yes.

Q. What part of his body was it pointed at?

A. Right up in here.

Q. Up to the chest?

A. Yes.

Q. And then you turned back around, you say?

A. Yes.

Q. And you say them? And when you—after you turned back around, that's when you heard the shot, is that it?

A. I turned back to Floyd and when I turned around, that's when the gun went off.

Q. That's when the gun went off.

A. That's right.

Q. Did you see the defendant, Donald Maxwell, shoot Rainey Hughes?

A. Yes. When I turned around, that's when the gun went off that was in his hand."

Thus, there was a sufficient time interval between appellant's pointing the gun at Rainey Hughes and appellant's pulling the trigger, for appellant to have considered the consequences of his act. In *Everett* v. *State* (1934), 208 Ind. 145, 195 N. E. 77, this Court said:

"In order that there may be such premeditated malice as will make a killing murder in the first degree the thought of taking life must have been consciously conceived in the mind the conception must have been meditated upon, and a deliberate determination formed to do the act. Where the homicide has been preceded by a concurrence of will, with an intention to kill, and these are followed by deliberate thought or premeditation, although they follow as instantaneous as successive thoughts can follow each other, the perpetrator may be guilty of murder in the first degree." 208 Ind. 149, 150.

In *Barker* v. *State* (1958), 238 Ind. 271, 150 N. E. 2d 680, this Court held:

"Under the offense charged in this case it was necessary to prove that the appellant killed 'with premeditated' malice. In other words, the proof must show the defendant had time to deliberate upon the intent and design to take life. We have said before: 'Premeditation by its very nature is not instantaneous but requires some time interval.' *Heglin* v. *State* (1957), 236 Ind. 350, 140 N. E. 2d 98." 238 Ind. at 279, 280.

In that case appellant was brandishing a knife among a group of companions, and just prior to the killing he told the

victim during an altercation, "I'll cut hell out of you." There is no indication as to the time lapse occurring between the threat and the killing but it seems to have been relatively short, yet sufficient for the appellant to have deliberated on his intent.

In this case there was similar lapse of time. The witness Mann said he saw appellant with a gun on Rainey. The witness turned around and talked to his friend, and when he turned around again, that's when the gun went off. Although there is no testimony as to how long this interval was, the pointing of the gun and the shooting were not simultaneous, but rather separated by a time lapse, sufficient for appellant to have deliberated upon his intent.

B.  Appellant's second contention is that there was insufficient evidence that the body examined by Dr. Petty and about which he testified at the trial, was the body of Rainey Hughes.

Dr. Petty testified at length concerning his examination of the dead body of Rainey Hughes. For example:

> "Q.  Now, Doctor, as a result of your examination, can you determine, with reasonable medical certainty, as to what was the immediate cause of death of the deceased Rainey Hughes?
> A.  Yes, I can.
> Q.  And what is that?
> A.  The cause of death was, specifically, massive internal bleeding, secondary to a gunshot wound of the chest and the abdomen."

The appellant did not object to any part of Dr. Petty's testimony and in no way raised the question of the hearsay nature of Dr. Petty's testimony. Appellant did not question the hospital procedures which Dr. Petty may have relied on to identify the body as that of Rainey Hughes, although there is no evidence that Dr. Petty did not personally know Rainey Hughes.

In addition, there is ample circumstantial evidence that the body examined by Dr. Petty was that of Rainey Hughes. The

body was of a white male, 40 years old, estimated at 190 pounds, overweight, 65″ in length, who died of a single gunshot wound in the chest. The examination took place at Marion County General Hospital on September 18, 1967, at 9:00 a.m. The doctor recovered a bullet from the body which he turned over to the Indianapolis Police Dept. and which he identified at trial as the one he took from the body. Dr. Petty also found the blood alcohol level to be .11% at 10.00 a.m. on September 18th.

Rainey Hughes was a white male, 46 years old, 5′ 5″ tall and overweight. Hughes was shot in the chest with a single bullet at around 8:00 p.m. on September 17, 1967, and taken to Marion County General Hospital, where he died around 2:00 a.m. on September 18th. He had been drinking a good deal prior to the shooting.

We think there was ample evidence that the body examined by Dr. Petty was that of Rainey Hughes.

C. Appellant argues that certain testimony of Mary Balay was hearsay and inadmissible in evidence. Appellant did not object to this testimony when offered at the trial, nor did he at any time make a motion to strike it from the record. Therefore this issue is not before this Court on appeal. *Hardin* v. *State* (1970), 254 Ind. 56, 257 N. E. 2d 671.

D. Appellant says that the verdict was contrary to law because of jury misconduct. After the jury had been instructed and started to deliberate they returned to the courtroom and asked "Do we have to come to a decision?" The trial court instructed the jury to return and continue with their deliberations. Appellant says this episode shows that the verdict of guilty was not the fair and free expression of the opinion of all the jurors. We do not agree. The question by the jury shows that *at that time* they had not reached a unanimous verdict. The trial court merely told them to continue deliberating and there is no reason to believe that the

jury was not properly instructed and functioning within those instructions. Appellant offered no affidavits nor evidence of any kind to support his argument. The burden is on appellant to show that the question by the jury and the trial court response was somehow prejudicial. *Williams* v. *State* (1923), 193 Ind. 670, 139 N. E. 657. Appellant did not do so and we see no error here.

E. Appellant alleges that the indictment was defective because it did not charge appellant with first degree murder. The indictment reads:

"The Grand Jury for the County of Marion in the State of Indiana, upon their oath do present that DONALD LEE MAXWELL on or about the 17th day of SEPTEMBER, A.D. 1967, at and in the County of Marion and in the State of Indiana, did then and there unlawfully, feloniously, purposely and with premeditated malice kill and murder RAINEY HUGHES, a human being, by then and there unlawfully, feloniously, purposely and with premeditated malice shooting at and against the body of the said RAINEY HUGHES, with a certain gun loaded with gunpowder and metal bullets, then and there held in the hand of the said DONALD LEE MAXWELL, and did then and there and thereby inflict mortal wounds in and upon the body of the said RAINEY HUGHES, of which mortal wounds the said RAINEY HUGHES then and there and thereby died; And so the Grand Jurors aforesaid, do say and charge that the said RAINEY HUGHES, in the manner and form and by the means aforesaid, unlawfully, feloniously, purposely and with premeditated malice did kill and murder the said RAINEY HUGHES, then and there being."

Appellant contends that the portion after the semi-colon is the only important section, the previous part being surplusage, and it does not charge appellant with First Degree Murder.

We do not agree. It is clear from reading the indictment up to the concluding clause (upon which appellant relies) that the Grand Jury has charged appellant with commission of First Degree Murder of Rainey Hughes. It is equally clear that the first mention of Rainey Hughes in the concluding clause is a mere clerical error.

In *Kennedy* v. *State* (1878), 62 Ind. 136, an indictment charged *John* Kennedy with First Degree Murder. However, the concluding clause thereof named *Frank* Kennedy as the accused. Defendant's motion to quash was overruled, and on appeal he argued that the concluding clause was repugnant to the previous portion. In rejecting that argument, this Court stated:

> "The indictment is unnecessarily prolix. It was complete in its charges of the murder, without the addition of the last clause, commencing with the words, 'And so the jurors aforesaid,' etc. *That clause was mere surplusage.* See Bicknell Crim. Tr., pp. 256, 257. It is manifest to any reader of the indictment that the word 'Frank' in the last clause is a mere clerical error.
>
> "The repugnancy complained of is in the portion of the indictment which is surplusage. This fact brings the case clearly within the following provisions of the statute:
>
> " 'No indictment or information may be quashed or set aside for any of the following defects : * * *
>
> " 'Sixth. For any surplusage or repugnant allegation, when there is sufficient matter alleged to indicate the crime and person charged ; nor
>
> " 'Seventh. For any defect or imperfection which does not tend to the prejudice of the substantial rights of the defendant, upon the merits.' 2 R.S. 1876, p. 386, Sec. 61."
> (Emphasis added.)

The Sixth and Seventh clause of the 1876 statute were retained as clauses Sixth and Tenth of the present statute, Acts 1905, ch. 169, § 192, being Burns Ind. Stat. Ann. § 9-1127.

Thus, appellant's contention that all which precedes the concluding clause is surplusage is not supported by Indiana law. Rather, the law is to the contrary. Appellant was sufficiently apprised of the nature of the accusation so as to enable him to prepare his defense.

Judgment affirmed.

Hunter, C.J., Arterburn, and Givan, JJ., concur; Jackson, J., concurs in result.

NOTE.—Reported in 260 N. E. 2d 787.