MARINA MARTIN AND KENNETH THORNTON *v.* STATE OF INDIANA.

[No. 273S23 and 273S24. Filed July 25, 1974. Rehearing denied October 18, 1974.]

*Palmer K. Ward,* of Indianapolis, *David F. McNamar,* of Indianapolis, for appellants.

*Theodore L. Sendak,* Attorney General, *Darrel K. Diamond,* Deputy Attorney General, for appellee.

DeBruler, J.—This is an appeal by co-defendants, Marina Martin and Kenneth Thornton, from their convictions of murder in the first degree (IC 1971, 35-13-4-1, being Burns § 10-3401) after a trial by jury in the Marion Criminal Court, Honorable Saul I. Rabb presiding. Both were sentenced to life imprisonment. Their appeals are based on the following grounds: (1) That the trial court erred in finding the evidence presented by the State sufficient to establish the necessary element of premeditation; (2) That the trial court's joint appointment of counsel to represent appellants at the trial denied them the effective assistance of counsel; (3) That the trial court misconstrued the phrase "capital offense" as it appears in the Juvenile Court Act (IC 1971, 31-5-7-4, being Burns § 9-3204[2] and IC 1971, 31-5-7-13, being Burns § 9-3213) and the statute concerning peremptory challenges (IC 1971, 35-1-30-2, being Burns § 9-1502); (4) That the introduction of a sum of money found on the person of appellant Martin was error since the State failed to sufficiently establish a chain of custody for the evidence; (5) That hearsay testimony was erroneously admitted to establish the license number of a car allegedly used in the shooting; (6) That the trial court erred in refusing to grant a mistrial when the prosecutor displayed an exhibit to the jury which had not been admitted into evidence; and (7) That the trial court erred in its refusal to read to the jury an instruction tendered by appellants.

The evidence introduced at this trial showed that John Mays was the operator of a Sunoco Service Station located on South Highway 31 in Marion County, Indiana. On March 18, 1972, at about 3 o'clock in the afternoon Mays, dressed

in a Sunoco Oil Company work uniform, was working in the back bay area of the station when his wife came in from the front office and asked him if he wanted anything from the store. He replied in the negative and his wife went back to the front office. Several seconds later Mays remembered he wanted cigarettes and walked out to the office to tell his wife. Upon entering the office Mays saw his wife running outside and he immediately followed her asking what was the matter. Mrs. Mays pointed toward a car in the station parking area and said, "They've got our money". Mays told his wife to stay where she was and he went toward the car, which he described as a 1972 red Nova Chevrolet with a black top.

As he approached the car a female, identified by Mays as appellant Martin, was sitting on the passenger's side of the car and a male, whom Mays identified as appellant Thornton, was in the process of entering the driver's seat. Mays grabbed Thornton by the shoulders and, as he did so, Thornton yelled, "Get the gun." Martin reached down to the floor of the car and pointed a .38 calibre revolver at Mays. Mays released Thornton and started to turn away from the car when he was shot in the stomach by Martin. As he fell to the ground by the car Mays heard his wife say, "My God you've shot my husband." Five to fifteen seconds later he heard another shot and saw his wife fall to the ground. She was pronounced dead at the Marion County General Hospital as a result of a single gunshot wound in the chest.

Two young employees at a restaurant located adjacent to the station testified that they heard two "popping sounds" from the Sunoco station and saw Mrs. Mays fall to the pavement. A black over red Chevrolet then left the station proceeding South on Highway 31 at a high rate of speed. Both boys testified that they wrote down the license number of the car, but one had forgotten it by the time of the trial. The other boy, however, was able to testify to the license number.

At approximately 3:30 that same afternoon an Indiana

State Policeman stopped a 1972 black over red Chevrolet Nova with the identical license plate at a point on Highway 31 about twenty miles South of the Sunoco station. Appellants Thornton and Martin were the only occupants of the car. Subsequent searches of appellants showed that Martin had $190 in cash in her underpants and Thornton had $88 in his pockets. Mays testified that there was approximately $220 missing from the cashbox kept in the front office of the gas station.

Before turning specifically to appellants' claim of insufficiency of the evidence we feel constrained to again reiterate that when called upon to decide this issue it is not our function as an appellate court to weigh the evidence at the trial below, or to decide questions concerning the credibility of witnesses. *Priola* v. *State* (1973), 260 Ind. 117, 292 N.E.2d 604. Rather we look to the evidence most supportive of the verdict and determine whether that evidence, along with the reasonable inferences which a jury might draw from it, has established all the necessary elements of the offense charged. *Smith* v. *State* (1970), 254 Ind. 401, 260 N.E.2d 558.

The statute under which appellants were convicted reads as follows:

"Whoever purposely and with premeditated malice . . . kills any human being, is guilty of murder in the first degree, and on conviction shall suffer death or be imprisoned in the state prison during life." Burns § 10-3401, *supra*.

In this case the death of the unarmed and non-combatative Mrs. Mays as a result of a gunshot wound caused by a .38 calibre pistol aimed and fired by a person identified by direct eye witness testimony as appellant Martin would clearly allow a jury to find the purposeful and malicious use of a deadly weapon in a manner calculated to cause and resulting in death. *Maxwell* v. *State* (1970), 254 Ind. 490, 260 N.E.2d 787. Appellants jointly assert, however, that there is a total

absence of any evidence on the necessary element of premeditation in the killing described above.

As we said in *Everett* v. *State* (1934), 208 Ind. 145, 195 N.E. 77:

> "In order that there may be such premeditated malice as will make a killing murder in the first degree the thought of taking life must have been consciously conceived in the mind, the conception must have been meditated upon, and a deliberate determination formed to do the act. Where the homicide has been preceded by a concurrence of will, with an intention to kill, and these are followed by deliberate thought or premeditation, although they follow as instantaneous as successive thoughts can follow each other, the perpetrator may be guilty of murder in the first degree." 208 Ind. at 149-150.

The element of premeditation thus requires that a defendant be able to appreciate the nature and consequences of the act. The evidence here allows a clear inference that appellant Martin was aware of the nature and consequences of what she was doing. Circumstances supportive of that inference include the length of time separating the two shootings, and her prior use of the weapon. The shooting of Mr. Mays creates a clear indication that Martin was aware of the nature of the weapon and the consequences of its use. The element of premeditation was sufficiently established by this evidence. *Sanders* v. *State* (1972), 259 Ind. 43, 284 N.E.2d 751.

We should also point out that the trial court instructed the jury pursuant to IC 1971, 35-1-29-1, being Burns § 9-102, which reads:

> "Every person who shall aid or abet in the commission of a felony, or who shall counsel, encourage, hire, command or otherwise procure a felony to be committed may be charged by indictment or affidavit, tried and convicted in the same manner as if he were a principle either before or after the principle offender is charged, indicted or convicted; and, upon such conviction he shall suffer the same punishment and penalties as are prescribed by law for the punishment of the principle."

Appellant Thornton participated in taking the money from the station office and, upon detection, ordered his companion to use a gun he obviously knew was present for the purpose of effectuating his escape. This is sufficient indication that he aided and abetted in the commission of the principle crime here. *Jewell* v. *State* (1974), 261 Ind. 665, 309 N.E.2d 441. We hold therefore that the evidence of first degree murder as to both appellants is sufficient.

Appellants' second contention involves the appointment of counsel to represent them. The record in this case reveals that on August 1, 1972, both appellants appeared in court and were informed that their privately retained counsel had withdrawn his appearance. The court then appointed two lawyers to represent appellants and stated:

"I want two lawyers to represent these people, together or separately, whichever way they would wish."

Appellants now contend that both the manner of the appointment of counsel by the trial court, and the actual conduct of the trial as revealed by the record, indicates that both attorneys jointly represented both defendants and that the United States Supreme Court decision in *Glasser* v. *U.S.* (1942), 315 U.S. 60, 62 S. Ct. 457, 86 L. Ed. 680, held that joint representation of co-defendants is so fraught with dangers of a conflict of interest between the defendants as to be a per se infringement on the effective assistance of counsel. We cannot agree with either that broad interpretation of the *Glasser* case, or that the facts of the case before us demonstrate a conflict of interest between these appellants.

Joint representation of co-defendants is not inherently ineffective and neither the *Glasser* opinion nor cases interpreting that opinion compel a contrary conclusion.[1] In

---

1. The following cases *inter alia* have all specifically rejected the rule that joint representation of co-defendants is a per se denial of the effective assistance of counsel. *Commonwealth* v. *Breaker*, 15 Cr.L. 2092 (Mar. 25, 1974), Pa. Sup. Ct.; *People* v. *Gutierrez* (1973), Colo., 511 Pac. 2d 20; *Palmer* v. *Adams* (1972), Conn., 294 A.2d 297; *U.S.* v. *DeBerry*,

■ *Glasser* one of the co-defendants objected to the joint representation being forced on him by the court and actually pointed out to the court prior to the trial in what respect his own interest would collide with his fellow defendants:

> "The possibility of the inconsistent interests of Glasser and Kretske were brought home to the court, but instead of jealously guarding Glasser's rights, the court may fairly be said to be responsible for creating a situation which resulted in the impairment of those rights." 315 U.S. at 71.

Here, on the other hand, no actual conflict or possible conflict was ever enunciated to the court either prior to, or at the trial itself, and none appears on the record of this ■ case. It is only on appeal that appellant Marina Martin has asserted that a possible conflict existed between herself and Thornton because she might have adopted a strategy of pleading to the jury her youth and lack of prior convictions as indications of being overly influenced by Thornton in the commission of the crime. We cannot agree that the possible use of this speculative defense strategy on the part of appellant Martin is of such significance as to constitute a conflict of interest hindering the effective assistance of counsel. As in most cases the attorneys who tried this case were confronted with many complex questions of judgment. The mere fact that they did not adopt every conceivable defense strategy on behalf of one of their clients cannot be viewed as ineffective representation.

Furthermore in *Glasser,* and all the cases cited by appellants, the factual situation concerned two defendants being represented by one attorney. In our case the trial court appointed two attorneys to represent two defendants in whatever manner they saw fit.[2] Thus the means of separate representa-

14 Cr.L. 2226 (2d Cir. 1973); *U.S.* v. *Gallagher,* 437 F.2d 1191 (7th Cir. 1971); *U.S.* v. *Williams,* 429 F.2d 158 (8th Cir. 1970).

2. Regardless of possible conflicts of interests the mere appointment of two attorneys avoided at least part of the problem of joint representation identified by the Supreme Court in *Glasser:* "irrespective of

tion was afforded by the trial court's appointment, while the tactical decision of separate or joint use of counsel was left to the defendants and their attorneys in their best judgment. The dangers of a real conflict of interest interfering with the effective assistance of counsel, therefore, is minor because of the presence of qualified attorneys able to investigate the possibility of conflict and free to represent their clients in whatever way desired. The joint or separate use of counsel in this trial was a judgmental decision made by two informed and qualified attorneys on behalf of their clients and we cannot say now that any apparent conflict of interest adhered to either defendant as a result of that decision.[3]

Appellants' next contention requires us to interpret certain language contained in two statutes in light of the United States Supreme Court's decision in *Furman* v. *Georgia* (1972), 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346, and our decision in *Adams* v. *State* (1972), 259 Ind. 164, 284 N.E.2d 757, declaring the death penalty unconstitutional as it had been applied prior to that time. The first is a statute contained in the Juvenile Court Act of 1945, which delineates

---

any conflict of interest the additional burden of representing another party may conceivably impair counsel's effectiveness." 315 U.S. at 75.

3. Although in this case the appointment and presence of two attorneys coupled with a lack of actual conflict between the co-defendants has convinced us that there is no denigration of the effective assistance of counsel, we recognize that joint representation of criminal co-defendants by a single attorney, or even by two attorneys in situations of antagonistic theories or defense, is a dangerous proposition. *Lloyd* v. *State* (1960), 241 Ind. 192, 170 N.E.2d 904; ABA Standards, "The Defense Function" App. Draft, § 3.5 (1971). Furthermore it is unnecessarily hazardous for both defendants and the integrity of the already completed trial process to postpone to the end of the trial an inquiry as to the existence of a conflict of interest between co-defendants. We would therefore urge, in order to avoid problems of this type in the future, that a trial court faced with joint defendants specifically appoint one attorney to each defendant for the purpose of making an initial inquiry of the facts of the case and possible theories of defense. If after this inquiry the attorneys decide there is no conflict of interest arising in the case they should report the same to the trial court prior to trial and the court should make a record of the report before releasing one of the attorneys from his appointment. See: *Ford* v. *U.S.*, 379 F.2d 123 (D.C. Cir. 1967), where the District of Columbia Circuit approved a similar approach in its implementation of sections of the Criminal Justice Act, 18 U.S.C. § 3006A (b)

the jurisdiction of the juvenile courts, and defines a delinquent child subject to the juvenile system as a person under eighteen years of age who, "commits an act which, if committed by an adult would be a crime not punishable by death or life imprisonment." IC 1971, 31-5-7-4, being Burns § 9-3204(2).

In our opinion in *Cummings* v. *State* (1969), 252 Ind. 701, 251 N.E.2d 663, we interpreted that language to refer only to crimes where there was a possibility of the imposition of death as a punishment. Appellant Martin now claims that the criminal court lacked subject matter jurisdiction to try her because at the time of the shooting here she was not yet eighteen years old and, as a result of the *Furman* and *Adams* decisions, there was no possibility of the imposition of the death penalty. She claims therefore that by the terms of the statute she was under the proper jurisdiction of the juvenile system and not the criminal courts. We do not agree.

It is helpful to point out that our task here is one of interpreting that legislative intent embraced in a 1945 Act fixing the jurisdiction of the juvenile courts. We do not believe that the opinions in *Furman* and *Adams* can be legitimately viewed as expressions of legislative intent on the issue of jurisdiction between court systems. It is apparent that the language in the 1945 Act referring to the death penalty was a definitional method of excluding certain persons who committed certain types of especially heinous offenses from the purely rehabilitative approach of the juvenile system. We believe it is clear from the statutory scheme of the Juvenile Court Act that the reference to the death penalty was intended to designate a certain group of crimes rather than a certain type of punishment. The subsequent decisions of the United States and Indiana Supreme Courts declaring the present use of the death penalty to be unconstitutional cannot be held as affecting this underlying legislative decision. We cannot agree that a reading of the statutes here indicates that the Legislature intended the jurisdiction of several court systems to be of such a fluid

nature as to be capable of alteration by judicial decisions concerning the constitutionality or applicability of the death penalty.

The second statute concerns the number of peremptory challenges made available to appellants.

> "In prosecutions for capital offenses the defendant may challenge peremptorily twenty jurors; in prosecutions for offenses punishable by imprisonment in the state prison, ten jurors; and other prosecutions three jurors. When several defendants are tried together, they must join in their challenges." Burns § 9-1502, *supra*.

At the voir dire prior to the trial in this case Martin and Thornton requested that they be afforded twenty peremptory challenges because they were on trial for a "capital offense". The trial judge denied their motions and restricted them to ten under the statute set out above.

Once again, of course, this requires us to apply an interpretation to statutory language which became open to interpretation only because of subsequent judicial decisions on unrelated matters, rather than legislative action. It is apparent that here the legislative decision to double the number of peremptory challenges is based on the nature of the punishment to be inflicted rather than the type of crime charged. Unlike the juvenile statute this is not an attempt to allocate the jurisdiction of offenses among court systems, thus presupposing a certain stability in interpretation, but is a safeguard for a defendant faced with choosing a panel which could conceivably impose the ultimate penalty upon him. It is clear that the capital nature of the punishment calls for an increase in the challenges, and where there would be no possibility of the imposition of that penalty, but only "imprisonment in the state prison" as in this case, the Legislature intended to afford defendants ten peremptory challenges. We hold that the trial court therefore correctly denied appellants' motions.

Appellants next contend that the trial court committed error by allowing a sum of $190.00 found in appellant Martin's

underpants into evidence because the State failed in its burden of establishing a proper chain of custody for the money. Testimony on this matter was provided by Renee Bastian, a matron at the Marion County Jail and John Ashton, a deputy in the Marion County Sheriff's Department. Bastian testified that on March 18th, she took appellant Martin to an office located in the Marion County Jail and thoroughly searched her. Bastian found $190.00 which she handed through an open door to Sgt. Rooney of the Sheriff's Department. Ashton testified that he was standing next to Rooney when Bastian handed Rooney the money. Rooney immediately turned to Ashton and gave him the money and he in turn placed it in a sealed envelope which he marked. Ashton further testified that the envelope remained in his custody from that date until it was opened at the trial.

On these facts the appellants' contentions must fail. The chain of custody rule in Indiana requires that before an exhibit may be introduced against a defendant at trial the State must establish a link between the defendant and the exhibit and also establish the whereabouts of the exhibit from the time of the seizure until its introduction at trial. *Graham* v. *State* (1970), 253 Ind. 525, 255 N.E.2d 652. The purpose of this rule is to insure the integrity of the evidence and protect it from substitution or tampering. In this case the State produced direct eye witness testimony tracing the movement of the money from the person of appellant Martin to the hands of Deputy Ashton where he placed it in a marked envelope which remained in his custody until it was re-opened at the trial. There is no break in the chain of custody here and the State's foundation for admission of this exhibit was sufficient. *Kolb* v. *State* (1972), 258 Ind. 469, 282 N.E.2d 541; *Guthrie* v. *State* (1970), 254 Ind. 356, 260 N.E.2d 579.

Appellants' next contention concerns a portion of the testimony of Officer Shay of the Marion County Sheriff's Department. Shay testified that he was one of the first police

officials on the scene after the shooting and that he placed an alarm over his radio for a car bearing a certain Kentucky license plate number. Officer Shay received this license number from persons who witnessed the shooting and subsequent flight of the automobile. Appellants' lawyers objected to the introduction of this license number on the ground that it was hearsay testimony, but the trial court overruled the objection. We believe the appellants were correct and that this type of evidence is indeed hearsay in nature.

"Hearsay evidence is testimony in court or written evidence of a statement made out of court, such statement being offered as an assertion to show the truth of the matters asserted therein, and thus resting for its value upon the credibility of the out of court asserter." *Harvey* v. *State* (1971), 256 Ind. 473, 476, 269 N.E.2d 759.

It is apparent from the posture of the evidence here that Officer Shay's testimony concerning an out of court identification of a license number furnished to him by a person not presently testifying is hearsay. It is also evident that the purpose of Shay's testimony was to establish the license number of the car which fled the Sunoco station after the shooting. Despite the contrary assertions of the State in its brief the only legally relevant use for the testimony at the time it was given by Shay was to establish the license number of the car in the minds of the jury. The State was not required, or even requested, at that point to show probable cause to stop the car and the testimony cannot be entered on the theory that it was not offered for the proof of the matters asserted therein. While Shay's testimony might be proper in a hearing on a motion to suppress it is improper evidence in a case on the merits of a defendant's guilt.

"Hearsay testimony that law enforcement officers use and rely upon for investigation and the gathering of competent and material evidence, of course is not evidence properly to be used in a trial of a criminal case." *Glover* v. *State* (1969), 253 Ind. 121, 126, 251 N.E.2d 814.

This is not to say, however, that the trial court's error in admitting this evidence must result in a reversal of this conviction. The error in this instance is a harmless one because of the testimony of the witness Wallace an employee of the steak house next to the gas station, who personally took down the license number of the car and testified to that number in trial. Clearly Wallace's testimony is not hearsay and thus the identical fact improperly sought to be established through Shay's testimony was properly established through Wallace's subsequent competent testimony.

Appellants next contend that the trial court erred in its failure to grant appellants' joint motion for mistrial which was made as a result of the prosecutor's handling of an envelope containing an exhibit not admitted into evidence. The exhibit with which we are concerned here is a .38 calibre pistol found by the police on the side of the highway a little less than a mile South of the gas station on the evening of the shooting. The prosecution attempted to enter the pistol into evidence but the trial court excluded it on the grounds that it was not closely enough connected with the appellants to be admissible against them. Some time later the prosecution was eliciting testimony from a witness in relation to fingerprint tests run on several pieces of evidence when he picked up an envelope with the excluded pistol inside. The trial judge halted the testimony, excused the jury from the room and cautioned the prosecutor against handling that exhibit. At that point appellants moved for a mistrial which was denied. Appellants did not request the judge to admonish the jury to disregard the prosecutor's handling of the envelope.

The decision which circumstances occurring during the course of the trial are so prejudicial as to require the withdrawal of the case from the jury rests largely with the trial judge *Duke* v. *State* (1968), 249 Ind. 466, 233 N.E.2d 159. Our review of the trial court's rulings on such matters, by its very nature, must concentrate on the peculiar situations and facts of each case as they present them-

selves. *White* v. *State* (1971), 257 Ind. 64, 272 N.E.2d 312. The situation confronted by the trial court here does not concern the introduction of a devastating evidentiary harpoon such as in the *White* case. Nor is this like the facts in *Rohlfing* v. *State* (1951), 230 Ind. 236, 102 N.E.2d 199, where the prosecution repeatedly and openly displayed to the jury exhibits which had been excluded by the trial court. The facts here indicate that the only item handled by the prosecution was a brown envelope within which was the evidence and there is no indication that the jury knew or could have easily discerned what was inside the envelope. Moreover the court, on its own motion, immediately excused the jury and cautioned the prosecutor against such tactics. Since it is not clear that the jury was even aware of the contents of the envelope, or that the prosecutor's conduct prejudiced appellants, the trial court was correct in its denial of their motions for a mistrial.

Appellants' last contention concerns their submission of a proposed jury instruction to the judge. Appellants contend that the refusal of the trial court to read to the jury their Instruction #13, which purports to define the term "purposely" as used in the court's instruction setting out the elements of first degree murder was reversible error. The trial court has a duty to give further instructions defining words used in other instructions only if the words are of a technical or legal meaning normally not understood by jurors unversed in the law. Since the word "purposely" is not used in a technical legal sense and is quite readily understood by the average layman, the court's refusal to give the instruction would not be an error.

The convictions here are affirmed.

Arterburn, C.J., Givan, Hunter and Prentice, JJ., concur.

NOTE.—Reported at 314 N.E.2d 60.

ON PETITION FOR REHEARING

DEBRULER, J.—Appellant Marina Martin has correctly pointed out in her petition for rehearing that an issue raised in the record and her briefs was not considered and resolved in the Court's original opinion. We now proceed to consideration of that issue. Appellant contends that she was denied the equal protection of the law, guaranteed by the Fourteenth Amendment to the United States Constitution in that she was required to exercise her ten peremptory challenges jointly with her co-defendant Kenneth Thornton. The statute which relegates appellant to this circumstance provides:

"In prosecution for capital offenses, the defendant may challenge, peremptorily, twenty jurors; in prosecutions for offenses punishable by imprisonment in the state prison, ten jurors; in other prosecutions, three jurors. When several defendants are tried together, they must join in their challenges." IC 1971, 35-1-30-2, being Burns § 9-1502.

Appellant accurately characterizes this statute as defining two classes of defendants, one class consists of those defendants who are tried alone, and the other class is comprised of those defendants who are tried jointly. Lone defendants are then granted ten peremptory challenges while co-defendants as a group are granted a total of ten peremptory challenges which they must collectively exercise. Despite the dissimilarity of treatment, we do not find this statute repugnant to the equal protection clause.

As a general principle a statute should grant equal treatment to those upon whom it acts. But if a statute should create and define several classes and dissimilarly assign burdens or benefits of the same type between the classes, the statute is not necessarily repugnant to the equal protection clause. If there is a reasonable basis for treating the classes dissimilarly then the statute may past muster. *Lindsley* v. *Natural Carbonic Gas Co.* (1911), 220 U.S. 61, 31 S. Ct. 337, 55 L. Ed. 369. And if there is a differential trait of the classes which is reasonably related to the purposes of the

statute, that fact supports the constitutional validity of the statute. *Smith* v. *Cahoon* (1931), 283 U.S. 553, 51 S. Ct. 582, 75 L. Ed. 1264; *Morey* v. *Doud* (1957), 354 U.S. 457, 77 S. Ct. 1344, 1 L. Ed. 2d 1485. And we are bound to accept as shown, any conceivable state of facts which would justify the classification. *Lindsley* v. *Natural Carbonic Gas Co., supra.* And when rights and burdens are being parcelled out to groups comprised of different numbers of persons, the individual in each such group is not necessarily entitled to identical treatment. *Dandridge* v. *Williams* (1970), 397 U.S. 471, 90 S. Ct. 1153, 25 L. Ed. 2d 491. We deem these principles applicable here since the peremptory challenge is itself not a fundamental right. *Hayes* v. *Missouri* (1887), 120 U.S. 68, 7 S. Ct. 350, 30 L. Ed. 578. This right is statutory and while it has utility as an adjunct to the jury selection process and adds to our confidence in the impartiality of the jury and the effectiveness of counsel, it is not by this important role sufficiently elevated to require the use of the more rigorous equal protection test. *Shapiro* v. *Thompson* (1969), 394 U.S. 618, 89 S. Ct. 1322, 22 L. Ed. 2d 600; *Carrington* v. *Rash* (1965), 380 U.S. 89, 85 S. Ct. 775, 13 L. Ed. 2d 675. The classes here are certainly not "suspect". *McLaughlin* v. *Florida* (1964), 379 U.S. 184, 85 S. Ct. 283, 13 L. Ed. 2d 222; *Graham* v. *Richardson* (1971), 403 U.S. 365, 91 S. Ct. 1848, 29 L. Ed. 2d 534.

The class to which appellant belongs, which is claimed here to be constitutionally disadvantaged, is identified by the fact that it is comprised of multiple defendants facing a joint jury trial. This class then is set aside and separately treated from the class of lone defendants. The purpose served by the limitation upon peremptory challenges is twofold. It serves to maintain the number of peremptory challenges at a workable level, and thereby it avoids the waste of judicial resources and the undue delay which would result from granting each defendant ten peremptory challenges and then even perhaps giving the State an increased number of peremptory challenges

in response to that. In *State* v. *Persinger* (1963), 62 W. 2d 362, 382 P. 2d 497, and *People* v. *King* (1966), 240 A. 2d 389, 49 Cal. Rptr. 562, equal protection challenges to similar statutes were rejected upon consideration of this justification alone. However in the case before us the limitation also serves the policy underlying IC 1971, 35-1-30-3, being Burns § 9-1503[1] which is to bring in balance the influence which the prosecution on one side and the defense on the other exert over the jury selection process by the use of peremptory challenges. If the influence of the two sides is not kept within some reasonable balance, the risk would exist that the jury produced would favor one side or the other.[2]

We are convinced therefore that the legislative decision to limit the number of peremptory challenges in the manner described was dictated by a need to fashion an efficient and expeditious jury selection process and to at the same time produce a jury neither prosecution nor defense minded. These needs are peculiarly magnified in the case in which more than one defendant is to be tried. It cannot be said that the disparate treatment of this statute is without a reasonable basis.

We are made more confident in this conclusion upon consideration of the right of all co-defendants to seek an individualized determination of the prejudice which this limitation may have upon the right to a trial by an impartial jury. Such a particularized investigation into possible prejudice flowing to a co-defendant from a joint trial is afforded by IC 1971, 35-3.1-1-11, being Burns § 9-913. If a severance of trials is ordered this statute would not apply to limit the number and exercise of peremptory challenges. In effect, a co-defendant can move out of this disadvantaged class of co-defendants upon a demonstration of actual prejudice flowing in the particular case.

1. "The prosecuting attorney shall have the same number of peremptory challenges as the defendant has in like cases."

2. The ABA Standards relating to Trial by Jury, § 2.6, makes no specific recommendation for standards to govern the distribution of peremptory challenges.

250

Appellant has also properly raised the issue again in her petition for rehearing that Burns § 9-1502, *supra,* is repugnant to the doctrine of Separation of Powers contained in Art. 3, § 1, of the Indiana Constitution. She contends that the judicial branch alone may deal with the subject matter of this statute. We find that this statute is not invalid on this ground. This same holding was at least implicit in *Neeley* v. *State* (1973), 261 Ind. 434, 305 N.E.2d 434.

The remaining issues raised in the petition of appellant Martin and all the issues raised in appellant Thornton's petition were adequately considered in the Court's original opinion. The petition of both appellants is now denied.

Arterburn, C.J., Givan, Hunter and Prentice, JJ., concur.

NOTE.—Reported at 317 N.E.2d 430.