Wade MEISBERGER, Appellant–
Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 53A01–9307–CR–243.

Court of Appeals of Indiana,
First District.

Sept. 26, 1994.

Transfer Denied Dec. 21, 1994.

Michael J. Spencer, Bloomington, for appellant.

Pamela Carter, Atty. Gen., Arthur Thaddeus Perry, Deputy Atty. Gen., Office of Atty. Gen., Indianapolis, for appellee.

ROBERTSON, Judge.

Wade Meisberger appeals his convictions of murder and theft, for which he received concurrent sentences of forty-eight and three years' imprisonment, respectively. We affirm.

Meisberger argues in this appeal:

(1) that the trial court committed reversible error when it permitted Dr. Robin Roberts to identify a decomposed body as that of Michael Sawyer by comparing the teeth of the body with dental x-rays which were never properly authenticated;

(2) that the trial court erred in denying Meisberger's motion for mistrial which was made after a police officer carried into the courtroom, in the view of the jury, a "2 × 4," an exhibit which had not been listed as evidence by the State during discovery or admitted into evidence;

(3) that the trial court erroneously refused Meisberger's proposed instructions on voluntary intoxication, despite evidence of marijuana and alcohol consumption;

(4) that the trial court erred in admitting into evidence the videotape of the autopsy; and,

(5) that the trial court erred in refusing to discharge the venire when it had been established that twenty-five of fifty prospective jurors had some knowledge of the case.

## I.

Deputy Coroner Robin Roberts, a dentist, testified over Meisberger's objection that the body he examined in the morgue on August 6, 1991, was that of Michael Sawyer. Dr. Roberts reached this conclusion by comparing his findings on the oral cavity of the body in the morgue, in particular, the absence of permanent tooth # 20 by the universal marking system and in its place a deciduous tooth, i.e. the victim's last baby molar, and a root canal in tooth # 10, with dental records he received from Dr. Berger the following day. Dr. Roberts testified that Dr. Berger's dental records, consisting in part of diagnostic radiographs taken as recently as 1990, were brought to him by messenger from Dr. Berger's office in Broad Ripple, Indianapolis.

Dr. Roberts also testified that he had sufficient expertise to evaluate the reliability and accuracy of the records, and that the records were normally found to be reliable and were customarily used by and relied upon by persons in his profession.

At trial, Meisberger objected to Dr. Roberts' opinion on the ground that an adequate foundation had not been offered for it. In this appeal, he argues that the trial court erred in permitting Dr. Roberts to offer the opinion that the body he examined in the morgue was that of Michael Sawyer because no foundational evidence had been offered to permit the admission of the radiographs and they were in fact never admitted into evidence. Meisberger maintains that error in admitting the opinion of Dr. Roberts renders the State's proof of the victim's identity fatally defective.

■ We observe that Meisberger has not raised any question as to the accuracy of the doctor's identification. Dr. Roberts compared the x-rays purporting to be those of Michael Sawyer and the teeth of the decedent and determined that the decedent's teeth were those captured in the radiographs. In the absence of some question as to the accuracy of his identification, it was competent for the doctor to rely upon hearsay information as to identity and to offer an opinion as to identity. See Teague v. State (1978), 269 Ind. 103, 127, 379 N.E.2d 418, 430.

■ Ordinarily, it is proper for an expert to rely upon the reports and results obtained by another expert and to offer an opinion based upon those reports. The documents relied upon need not be admitted. Lockhart v. State (1993), Ind., 609 N.E.2d 1093 (reliance upon autopsy report prepared by another); Wickliffe v. State (1981), Ind., 424 N.E.2d 1007 (autopsy report prepared by another pathologist not put into evidence), cert. denied, —— U.S. ——, 112 S.Ct. 1594, 118 L.Ed.2d 310; Morris v. State (1977), 266 Ind. 473, 481–2, 364 N.E.2d 132, 138, cert. denied, 434 U.S. 972, 98 S.Ct. 526, 54 L.Ed.2d 462; Davis v. State (1983), Ind.App., 456 N.E.2d 731, 733. Hearsay evidence customarily relied upon by an expert in the

practice of his profession may be admitted and relied upon as the legitimate accumulation of that expert's knowledge. *Bixler v. State* (1984), Ind., 471 N.E.2d 1093, 1099, *cert. denied,* 474 U.S. 834, 106 S.Ct. 106, 88 L.Ed.2d 86. When the factual content of a medical report is admitted in conjunction with the detailed findings of a witness who has performed an autopsy as the basis for his own medical conclusions, the testimony reflecting that content is not hearsay. *Wilber v. State* (1984), Ind., 460 N.E.2d 142, 143.

Moreover, the x-rays need not be admitted into evidence to ensure that a defendant is not deprived of a meaningful opportunity to cross-examine the expert witness. The best evidence available to the trier of fact is not the x-rays themselves but the testimony of the expert skilled in interpretation. *Pinkerton v. State* (1972), 258 Ind. 610, 621–2, 283 N.E.2d 376, 382. The defendant is entitled to examine the films for purposes of cross-examination or to enable his own expert witness to offer his opinion, if different from that of the State's witness. *Id.,* 258 Ind. at 622, 283 N.E.2d 376.

The identity of a person examined by a physician and about whom the doctor testified at trial as an expert witness may be established by circumstantial evidence. *Maxwell v. State* (1970), 254 Ind. 490, 260 N.E.2d 787, *cert. denied,* 402 U.S. 930, 91 S.Ct. 1525, 28 L.Ed.2d 863; *Scott v. State* (1980), Ind.App., 409 N.E.2d 1184, 1189. *See also Graham v. State* (1989), Ind., 535 N.E.2d 1152; *Phillips v. State* (1982), Ind., 436 N.E.2d 1123; *Eiffe v. State* (1948), 226 Ind. 57, 77 N.E.2d 750. Any lack of certainty as to identity goes to weight, not admissibility. *Teague,* 379 N.E.2d at 430; *Scott,* 409 N.E.2d at 1189.

The record in this case contains ample circumstantial evidence, in addition to the testimony of Dr. Roberts, from which the jury could have determined that the body found along the tracks in Bloomington was that of Michael Sawyer. Meisberger himself testified that he had gone to the tracks with Sawyer, killed him while there, and then left the body. Meisberger told his former fiancee that he had killed Michael Sawyer and

left his body at the tracks. Police discovered the body along the tracks as Meisberger's fiancee had recounted and acquired the information necessary to obtain the dental records from Sawyer's parents contemporaneously. Sawyer had come to Bloomington to visit with Meisberger and had never returned home. Meisberger's neighbor and later, Meisberger's fiancee, each saw Meisberger with Sawyer's car shortly after Sawyer's death.

The trial court did not commit any error in permitting Dr. Roberts to testify that, using dental records he believed to be those of Michael Sawyer, he had determined that the decedent was in fact Michael Sawyer.

## II.

Meisberger contends that he was denied a fair trial and should have been granted a mistrial when, during the opening minutes of the testimony of Dr. Ellis, the pathologist who performed the autopsy on the body of Michael Sawyer, a police officer entered the courtroom carrying a "2 × 4," which, upon objection by Meisberger, the prosecutor stated he intended to use as illustrative evidence during Dr. Ellis' testimony. Meisberger objected to the exhibit's "being brought in in full view of the jury," when it had not yet been offered into evidence, and moved for a mistrial without stating any additional grounds.

The thrust of Meisberger's argument on appeal is that, in the absence of real physical evidence, the State exhibited inadmissible "nonevidence" without obtaining the trial judge's approval beforehand or disclosing its intent to do so during discovery, in a deliberate effort to bolster its own case at the expense of the defense. Meisberger argues that he was prejudiced by the displaying of the "2 × 4" because "it contradicted [his] direct testimony. [Meisberger] testified that he hit Sawyer with a tree limb in a desperate act of self defense and that his actions were not pre-meditated."

Meisberger's objection at trial was limited solely to his contention that the exhibit could not be viewed by the jury before it had been admitted into evidence. He voiced no concern about the State's failure to comply with

the rules of discovery and offered no argument whatsoever on the exhibit's admissibility. As it turns out, the prosecutor reconsidered the object's benefit to the State as an illustrative exhibit and withdrew it from the courtroom. The exhibit was never shown to a witness or offered into evidence. Accordingly, we perceive the allegation of error properly preserved for review to be Meisberger's contention that he was entitled to a mistrial because the State permitted the jury to view an exhibit which had not yet been introduced into evidence.

▇▇▇▇ The standard for determining the significance of prosecutorial misconduct was set out in *Maldonado v. State* (1976), 265 Ind. 492, 498, 355 N.E.2d 843, 848. *Murray v. State* (1982), Ind., 442 N.E.2d 1012, 1018. First, the court must determine whether the prosecutor did, in fact, engage in misconduct as defined by the case law of the jurisdiction, the disciplinary rules, and the rules of professional conduct. *Id.* Second, the court must determine if, when viewed from the totality of the circumstances of the case, misconduct placed the defendant in a position of grave peril to which he should not have been subjected. *Id.* (citing *White v. State* (1971), 257 Ind. 64, 272 N.E.2d 312). In determining whether or not the defendant was subjected to grave peril by the misconduct of the prosecutor, the court will look to the probable persuasive effect of the misconduct on the jury's decision, not to the degree of impropriety of the conduct. *Id.* The granting of a mistrial is an extreme remedy which should only be used when no other action can rectify the situation. *Schlomer v. State* (1991), Ind., 580 N.E.2d 950, 955. The trial court has discretion in determining whether to grant a mistrial, and the decision is afforded great deference on appeal because the trial court is in the best position to gauge the surrounding circumstances and the event's impact on the jury. *Id.*

Meisberger has not cited us to any authority in support of his position that the displaying of illustrative exhibits to the jury before admission has been sought constitutes prosecutorial misconduct. We have found only two Indiana cases touching upon this point: *Dorton v. State* (1981), Ind., 419 N.E.2d 1289, and *Springer v. State* (1984), Ind., 463 N.E.2d 243. In *Dorton,* the Indiana Supreme Court held that a legitimate and permissible attempt to have items of real evidence identified by a witness, even though the exhibits ultimately were excluded from evidence, did not constitute misconduct and that an admonishment to disregard the exhibits was adequate to cure any prejudice. In *Springer,* the same court held that, while a knife which was not the knife used in the attack should not have been admitted, the knife could have been used at trial to illustrate and explain the oral testimony.

▇▇▇▇ Demonstrative evidence broadly includes all phenomena which can convey a relevant firsthand sense impression to the trier of fact, as opposed to those which serve merely to report the secondhand sense impressions of others. J. Strong, McCormick on Evidence § 212 (4th Ed.1992). Demonstrative evidence often possesses unusual persuasive force because it permits the trier of fact to derive its own perception and may convey an impression of objective reality to the trier of fact. *Id. See, e.g., Rust v. Guinn* (1981), Ind.App., 429 N.E.2d 299 (Jar of chicken manure relevant in that it is illustrative of the nature of odors experienced by landowners on property). Demonstrative evidence is tendered for the purpose of rendering other evidence comprehensible to the trier of fact. McCormick on Evidence, § 212.

▇▇▇ To be admissible, demonstrative evidence need only be sufficiently explanatory or illustrative of relevant testimony in the case to be of potential help to the trier of fact. *Underly v. Advance Machine Co.* (1993), Ind.App., 605 N.E.2d 1186, 1195, *trans. denied. Accord SCM Corp. v. Letterer* (1983), Ind.App., 448 N.E.2d 686, 692; *Snyder v. State* (1979), 182 Ind.App. 24, 393 N.E.2d 802. "Generally, demonstrative exhibits are admissible in the trial court's sound discretion because '[o]rdinarily, whatever the jury may learn through the ear from descriptions given by witnesses they may learn directly through the eye from the objects described.'" *Letterer,* 448 N.E.2d at 692. A substantially similar duplicate is unobjectionable. *Id.*

Dr. Ellis testified that Michael Sawyer died of a massive skull fracture in the occipital area, "particularly the back of the skull with extension over the, both sides, right and left and extending forward all the way to just above the right eye." Some bone fragments were totally displaced and there were other linear fractures going through the skull radiating out of the area where the bones had been displaced. Dr. Ellis used a replica of the skull to illustrate the extent of damage to Sawyer's skull, and the jury had the opportunity to view Sawyer's actual skull, with the bone displaced, through the videotape of the autopsy. According to Dr. Ellis, the trauma sustained by Sawyer's skull came from a force applied over a larger, broader area than that produced by an object such as a ball peen hammer. He could not, however, identify the specific blunt object that caused the injury or determine the number of blows, how the blows were delivered, or the direction of the blows.

Whether Dr. Ellis could not make these specific determinations because of the state of decomposition of the body, and hence, the absence of evidence upon which to form a conclusion, or simply because he did not have sufficient expertise to express an opinion is not apparent from the record. Whatever the reason, by his own admission, Dr. Ellis could offer no opinion as to the cause of death other than that a blunt instrument had been used. A "2 × 4" is no more probative or demonstrative on this point than the tree branch Meisberger testified he used. Therefore, on the state of the record before us, which we reiterated does not reflect any attempt by the prosecutor to obtain admissibility, we express doubt that the "2 × 4" could have been used in such a manner as to be of potential help to the jury.

Nevertheless, assuming the exhibit was ultimately determined to be inadmissible, to obtain reversal, Meisberger must show that the jury's exposure to the exhibit placed him in a position of grave peril to which he should not have been subjected. When the totality of the circumstances before the jury are taken into account, we cannot discern such peril.

First, there was testimony, the veracity of which Meisberger admitted, that he had told his former fiancee that he had struck Michael Sawyer twice in the head with a "2 × 4," slit his throat and disposed of the weapons en route to Florida. The extensive nature of the skull fracture sustained by the victim, and the absence of any possible weapon at the scene, despite a thorough search, certainly tended to corroborate Meisberger's earlier version of the events. Dr. Ellis could not say whether or not Sawyer had sustained an injury to his neck; the head and neck area had almost completely decomposed.

Second, although Meisberger testified that he acted in self-defense, his own version of the events, even if wholly believed by the jury, did not present a viable defense under the court's instructions. The court instructed the jury that "[a] person is justified in using deadly force only if he reasonably believes that deadly force is necessary to prevent serious bodily injury to himself." "In determining whether or not the defendant ... reasonably believed that deadly force was necessary to prevent serious bodily injury to himself, you should look at the situation from the defendant's point of view at the time force was used by the defendant."

Meisberger testified that he did not want to fight Sawyer because he had wrestled with him before, knew his strength and feared for his safety. But, up until the time Meisberger killed Sawyer, Sawyer had done nothing more to Meisberger than to prevent him from leaving, by putting him in a "bear hug." Meisberger had freed himself and Sawyer was down after having stumbled backward when Meisberger used deadly force. He could have retreated and left. No blows had been exchanged prior to this time. The force used was thus not objectively reasonable or commensurate under the circumstances. *Cf. Whipple v. State* (1988), Ind., 523 N.E.2d 1363, 1367, *cert. denied,* —— U.S. ——, 113 S.Ct. 218, 121 L.Ed.2d 157.

For these reasons, we are led to conclude that the jury's viewing of the "2 × 4" could not have had a significant persuasive effect upon its decision, and a mistrial under the totality of the circumstances was not warranted. A curative instruction as in *Dorton* would have sufficed.

### III.

Meisberger contends that the trial court committed reversible error by refusing to give his tendered instructions on the defense of intoxication. As the State argues, Meisberger has not included a verbatim copy of the instructions which were refused or his objections to them in his brief, thereby waiving any error. *Gibson v. State* (1987), Ind., 516 N.E.2d 31, 32; *Collins v. State* (1987), Ind., 509 N.E.2d 827, 831. Nonetheless, the trial court did not err in refusing the instructions.

Intoxication is generally not a defense except where it renders the accused incapable of forming or entertaining a required specific intent. *Williams v. State* (1980), 273 Ind. 105, 108, 402 N.E.2d 954, 955. Where a defendant is intoxicated, yet his actions show he has the ability to form the requisite mens rea, he may not use the defense of intoxication. *Gibson*, 516 N.E.2d at 33. An adequate evidentiary basis exists for an instruction on the defense of intoxication where the evidence of intoxication, if believed, is such that it could create a reasonable doubt in the mind of a rational trier of fact that the accused entertained the requisite specific intent. *Williams*, 402 N.E.2d at 955. If it could do so, the refusal of an instruction is error. *Id.* Accord *Gibson*, 516 N.E.2d at 32–3; *Hubbard v. State* (1984), Ind., 469 N.E.2d 740, 742.

The evidence of Meisberger's alcohol consumption and its intoxicating effects came almost entirely from Meisberger's own testimony. Meisberger told the jury that he met Michael Sawyer at the end of Twentieth Street. He got in the car with Sawyer and they proceeded to Chi Chi's for dinner. On the way, they smoked a marijuana cigarette. They ate a big meal at Chi Chi's. Meisberger had a couple of margaritas. After dinner, Meisberger and Sawyer went to a place Meisberger called "the tracks" where they shared a bottle of Tequila and a "hooter," which Meisberger described as a big marijuana joint he made "three by three." Sawyer's death occurred shortly thereafter.

According to Meisberger, when he tried to leave, Sawyer, a weight lifter who benchpressed three hundred pounds, would not let him pass and pushed him back. Sawyer grabbed hold of Meisberger but Meisberger eventually broke free and was able to push Sawyer away. As Sawyer was getting up, Meisberger got a branch and hit Sawyer in the back of the head one time. Meisberger knew by the sound of the blow that he had hit Sawyer too hard. He leaned down next to Sawyer and pushed his shoulders. Sawyer did not get up. Meisberger lit his lighter to see if Sawyer was alright. He saw blood. Meisberger took the keys to Sawyer's car and drove back to his apartment where, the State established, he had a conversation with a neighbor and took some of his roommate's audio tapes and Sawyer's clothes. He then fled to Florida in Sawyer's car.

Meisberger's own account of the events leading to Michael Sawyer's death establishes that, despite his consumption of alcohol and marijuana, he had the physical ability to propel a tree branch with such force as to render a death-producing blow. The pathologist who performed the autopsy on Sawyer's body testified that Sawyer suffered a massive skull fracture to the back of his skull with extension over both sides of his head, forward to just above the right eye. The blow to Sawyer's head moved the bone away from its normal outline. Meisberger's account of Sawyer's death also establishes that Meisberger had the presence of mind and the physical ability to operate a cigarette lighter, take Sawyer's keys from his person, gain access to his apartment and gather a few possessions for the trip. Meisberger did not testify that, because of his intoxication, he did not know what he was doing at the time of Sawyer's death but rather, admitted upon cross-examination that when he picked up "the club" it was his intention to strike Sawyer with it. Thus, his own testimony established that he was fully capable of forming the requisite intent to commit the crime of murder and that an instruction on the defense of intoxication was not warranted by the evidence. *Cf. Rocha v. State* (1989), Ind., 542 N.E.2d 190; *Springer v. State* (1984), Ind., 463 N.E.2d 243.

## IV.

Meisberger contends that the exhibition of a videotape of the autopsy of Michael Sawyer constitutes reversible error because the videotape depicted Sawyer's body in an altered state, was inflammatory, and served only to unfairly prejudice the jury. The autopsy had been included upon a videotape made of the crime scene. The State sought its admission during the testimony of David Lee Cobb, the evidence technician who made the tape. Meisberger objected at that time on the grounds that the tape could produce no useful evidence, that it would not clarify the pathologist's testimony, that it was designed to inflame the jury, and did not accurately reflect the state of affairs at the time the event occurred. Later, during the testimony of Dr. Charles Ellis, Meisberger objected "for the same reasons stated many times," and moved for a mistrial on the grounds that it would serve only to inflame the passions of the jury and that no foundation had been laid for it to be shown. The record discloses that the trial judge did view the videotape during pretrial proceedings.

We too have viewed the videotape and should state that the tape does not show the actual autopsy or the body in an altered state as a consequence of the autopsy. It does show Dr. Ellis attempting to remove the decedent's clothing from the area of his chest. At one point, Dr. Ellis enters the skull with an instrument; we presume from the trial testimony which accompanied the videotape's viewing by the jury that this is the point at which Dr. Ellis stated he was attempting to remove fluid.

Without question, the videotape is difficult to watch. It graphically depicts the extent of the body's decomposition and maggot infestation in a way that still photographs could not capture. But, the nature of the damage sustained by the decedent's skull is also readily apparent. This aspect of the tape also permits the jury to perceive the injury in a way the words "massive skull fracture" simply cannot convey. As probative evidence, it is imminently superior to the doctor's testimony.

As a general rule, the standards applicable to the admissibility of photographs apply to videotapes. *Bellmore v. State* (1992), Ind., 602 N.E.2d 111, 118; *Harden v. State* (1991), Ind., 576 N.E.2d 590, 595. The trial court in its discretion may admit photographs that depict graphically the injuries of the victim. *Bellmore*, 602 N.E.2d at 118. Photographs that demonstrate a witness' testimony are generally admissible. *Id.* To exclude them from evidence, a defendant must show that the improper influence of the photographs on the jury outweighs their probative value to such an extent that they are unduly prejudicial. *Id. Accord Williams v. State* (1990), Ind., 555 N.E.2d 133, 138. At the time of trial, the prevailing standard for judging potentially prejudicial evidence was that set forth in Federal Rule of Evidence 403, *Hardin v. State* (1993), Ind., 611 N.E.2d 123, 128:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.

Indiana law contains a slightly narrower rule for some autopsy photographs. The case law stresses the difference between photographs which show the victim in his or her natural state following death and those which show the body after it has been altered by autopsy. *Loy v. State* (1982), Ind., 436 N.E.2d 1125 (cited as authority in *Jackson v. State* (1992), Ind., 597 N.E.2d 950, 963, *cert. denied*, —— U.S. ——, 113 S.Ct. 1424, 122 L.Ed.2d 793). Photographs which show the deceased's body before the pathologist's dismantling have been held admissible despite their gruesome or gory subject matter. *Loy*, 436 N.E.2d at 1128. *See e.g. Jackson*, 597 N.E.2d 950; *Thacker v. State* (1990), Ind., 556 N.E.2d 1315. Photographs taken after or during the course of an autopsy, however, are particularly suspect. *Jackson*, 597 N.E.2d at 963. The graphic portrayal of an autopsy by photograph carries the potential for displaying more than the state of the victim's body at the time it was discovered. Such a display may impute the handiwork of the physician to the accused and thereby render the defendant responsible in the

minds of jurors for cuts, incisions, and the indignity of an autopsy. *Loy,* 436 N.E.2d at 1128.

Accordingly, autopsy photographs are not admissible if they show the body in an altered state and do not tend to prove or disprove some material fact in issue. *Kiefer v. State* (1958), 239 Ind. 103, 114, 153 N.E.2d 899, 903. Action shots and cuts, incisions and other scars left on the body after the autopsy has been performed are at the heart of what is objectionable under *Loy* and *Kiefer.* *Brown v. State* (1983), Ind., 448 N.E.2d 10, 18. The critical inquiry is whether the photographs are relevant to the issues in the case. *Warrenburg v. State* (1973), 260 Ind. 572, 573–4, 298 N.E.2d 434, 435.

The test for determining relevance in this context is whether or not a witness would be permitted to verbally describe that which the photograph depicts. *Grimes v. State* (1983), Ind., 450 N.E.2d 512, 516. Where the relevant portion of a photograph has been obscured by irrelevancy, the supreme court has held that it should be denied admission into evidence. *Warrenburg,* 260 Ind. at 574, 298 N.E.2d 434.

Hence, under *Loy* and *Kiefer,* the jury should not have been permitted to view Dr. Ellis attempting to remove fluid with a syringe from what remained of Sawyer's brain. His actions had no tendency to prove any material issues in the case. Similarly, while there was testimony of maggot infestation, no witness would have been permitted to describe the visual impression made by the videotape, and the prejudicial nature of these close-ups plainly outweigh their probative value. These parts of the tape should have been excised.

Even so, as we have indicated, much of the tape is either unobjectionable because it depicts the body without alteration as it was discovered, or contains truly relevant evidence. Given the extremely probative force of the depiction of the skull, and the material nature of the issues to which it relates, i.e. the accidental or unintended killing of another human being, we are unable to conclude that the trial court abused its discretion in weighing the probative value of the tape against its prejudicial effect. Under these circumstances, the admission of such a videotape was not error. *Cf. McCord v. State* (1993), Ind., 622 N.E.2d 504 (Jaw removed from burn victim).

V.

Lastly, Meisberger argues that he was not given the opportunity to pick a truly impartial jury because twenty-five of the fifty member venire had been exposed to some form of pretrial publicity. The murder of Michael Sawyer had been in the Bloomington newspaper at the time Sawyer's body was discovered, and again when the murder and search for Meisberger became the subject of a segment of "America's Most Wanted" television show. On the morning of trial, the newspaper published an article about the commencement of the trial. Meisberger moved on two occasions to discharge the venire. Both occasions occurred before any of the prospective jurors had been questioned.

The trial court took steps immediately to ascertain the extent of the venire's exposure to the publicity surrounding the case. The trial court and attorneys questioned individually each of the persons who indicated he or she had some knowledge of the case. Of those, only four persons were removed for cause. Six of the initial twenty-five either became jurors or served as an alternate; Meisberger made no motion to challenge any of these six people for cause. We can discern from the record of voir dire which persons were removed for cause and which were removed by peremptory challenge but there does not appear to be any record of whether Meisberger exhausted his peremptory challenges. He plainly decided not to use his challenges to obtain a jury which had had absolutely no exposure whatsoever to the circumstances of the case.

The constitutional standard of fairness requires that a defendant have "a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd,* 366 U.S. [717] at 722, 81 S.Ct. [1639] at 1642 [6 L.Ed.2d 751 (1961)]. Qualified jurors need not, however, be totally ignorant of the facts and issues involved.

"To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more,

is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.*, at 723, 81 S.Ct. at 1642. At the same time, the juror's assurances that he is equal to this task cannot be dispositive of the accused's rights, and it remains open to the defendant to demonstrate "the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality." *Ibid.* *Murphy v. Florida* (1975), 421 U.S. 794, 799–800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589. *Accord Taylor v. State* (1987), Ind., 515 N.E.2d 1095, 1097; *Drollinger v. State* (1980), 274 Ind. 5, 408 N.E.2d 1228.

Of the six persons with some knowledge of the crime who became jurors, only two had any recollection of the circumstances surrounding the crime. All said they had not formed an opinion about Meisberger's guilt or innocence. The person who had the most knowledge about the murder and Weisberger's apprehension was chosen as the alternate; he never was called upon to deliberate.

In cases where the general atmosphere in the community is sufficiently inflammatory or most members of the venire will admit to a disqualifying prejudice, the reliability of others' assertions of impartiality may be called into question. *Id.* Here, however, only four of fifty admitted to such a predisposition. This "by no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own." *Id.* 421 U.S. at 803, 95 S.Ct. at 2038.

Accordingly, we find no basis for concluding that Meisberger was denied a fair trial by reason of the venire's exposure to pretrial publicity. The trial court properly denied Meisberger's motion to discharge the venire.

Judgment affirmed.

RILEY and BARTEAU, JJ., concur.