**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



**FILED**

Jun 19 2013, 7:17 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MATTHEW J. MCGOVERN**
Anderson, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JOSEPH Y. HO**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| CHRISTOPHER BAXTER, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 22A01-1210-CR-447 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE FLOYD SUPERIOR COURT
The Honorable Maria D. Granger, Judge
Cause No. 22D03-1202-MR-223

**June 19, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

Christopher Baxter appeals his Murder[1] conviction, as well as the sentence imposed by the trial court. Baxter presents the following restated issues for our review:

1. Did the trial court abuse its discretion in admitting hearsay evidence?

2. Did the trial court abuse its discretion in admitting as demonstrative evidence a replica of an aluminum bar alleged to be the murder weapon?

3. Did the trial court's failure to preserve the aluminum bar alleged to be the murder weapon violate Baxter's due process rights?

4. Did the trial court's imposition of a fifty-five-year sentence violate state and federal constitutional protections against *ex post facto* laws?

We affirm in part, reverse in part, and remand.

In 1990, Baxter and his wife, Robin Baxter (Robin), lived together in a house on Troy Street in New Albany, which was located in close proximity to the Ohio River. Baxter kept a solid aluminum bar, which was approximately one and three-quarter inches in diameter and thirty-six inches in length, in the residence for protection. Baxter kept the bar propped up against a wall near a closet and nicknamed it "the Enforcer" or "the Equalizer." *Transcript* at 304, 358.

On the evening of June 19, 1990, a Tuesday, Baxter and Robin were drinking together and got into an argument, during which Baxter broke out the glass in the back door. At around 10:00 p.m., Robin called her friend Tanita Edelen from her home. Robin was very upset, sounded as if she had been crying, and spoke to Edelen in a whisper. Robin told Edelen that Baxter "had been acting worse than she'[d] ever seen him" and that he was going

---

[1] Ind. Code Ann. § 35-42-1-1 (West, Westlaw current through P.L. 135 with effective dates through April 30, 2013).

to kill her. *Id.* at 446. Based on what Robin told her, Edelen feared that Robin's life was in danger.

Sometime between 10:00 p.m. and midnight that same night, the Baxters' neighbor, Joseph Perry, heard Robin shouting for someone to stop. Robin then walked up the street and stopped to talk to Perry. Perry saw that Robin was wearing a tank top, cut-off denim shorts, and flip flops. Perry also noticed than Robin had blood on her eye, lip, and shirt, and that she was visibly shaking. Robin told Perry that she was going to try to call her mother because she was scared, and then walked away toward a nearby store. At that time, Baxter, who had been sitting in a lawn chair outside his house, got up and went inside. From the way that Baxter walked, Perry believed he might have been drinking. Shortly thereafter, Perry went inside for the night and did not see Robin again.

The next morning, Robin's friend, Wilma Carlisle, stopped by the Baxter residence to pick up some cupcakes that Robin had offered to bake for Carlisle's children. Robin was not present, but Baxter let Carlisle into the house. Carlisle noticed a hole in the wall, which had not been there when Carlisle had visited the previous Monday. Carlisle asked Baxter what happened to the wall, and he responded that "he'd rather punch the wall than punch [Robin]." *Id.* at 487.

Some time that same morning, Baxter called one of Robin's close friends, Suzanne "Spring" Monroe, and told her that Robin was missing. Spring and her then-boyfriend,

Charlie Lance,[2] went to the Baxter residence to look for Robin. Upon arrival at the Baxter residence, Spring noticed that Robin's jean shorts were on the floor in the corner and that there were knick knacks on the floor, which Spring found odd because Robin usually cleaned her home every day. Spring and Charlie both saw that the glass in the back door had been broken out and covered with a piece of plywood. Baxter told them he had knocked out the window because he was upset that Robin was gone. Spring and Charlie both also saw that a hole in the drywall near a closet had recently been repaired, and the paint was still wet. The hole had not been there when Spring had last visited the Baxter residence the previous Sunday.

Spring and Charlie then began to look for Robin with Baxter. Spring was looking in a brushy area near a set of railroad tracks when Baxter came "running and screaming" at her in a very harsh tone and told her not to look there because he had already done so. *Id.* at 295. Spring felt threatened by Baxter's reaction, so she complied. Baxter had a similar reaction when Charlie began looking near the railroad tracks; Baxter told Charlie that he did not need to look there because Baxter had already done so. Charlie found Baxter's behavior "suspicious." *Id.* at 348. When Spring and Charlie returned to the Baxter residence the next day, Spring saw that Baxter had scratches all over his shoulders, arms, and back. When Spring asked Baxter what had happened to him, he stated that he had been crawling around on the ground looking for Robin.

---

[2] Spring Monroe and Charlie Lance were married some years later, and are both referred to in the transcript with the surname Lance. Accordingly, we will refer to them by their first names in order to avoid confusion.

Edelen went to the Baxter residence at around 4:00 p.m. on the Friday after Robin's disappearance. Edelen observed that Baxter had placed all of Robin's things in the middle of the floor and rearranged everything in the house. Edelen was surprised to see Robin's shoes among her things, because Edelen had only known Robin to wear one pair of shoes and believed that Robin would not have gone anywhere without her shoes. Some time that weekend, Carlisle returned to the Baxter residence and saw that the hole in the wall she had seen on Wednesday had been repaired and that the metal bar Baxter had nicknamed "the Enforcer" or "the Equalizer" was missing from its usual spot.

The Louisville Police Department found Robin's body in the Ohio River on Saturday, June 23, 1990. Robin was wearing a black t-shirt and was naked from the waist down. Autopsy reports revealed that the cause of death was blunt force trauma to the back of the head. Robin also suffered multiple lacerations to her face and head sustained before her death. Robin's death was ruled a homicide.

Detectives from the New Albany Police Department interviewed Baxter twice shortly after the discovery of Robin's body. During the first interview, Baxter admitted that he and Robin had argued over a spaghetti dinner Robin had cooked. Baxter stated that he smashed the window out of the back door during that argument. Baxter claimed he went to sleep, woke up and saw that Robin was not there, and then went back to sleep. During the second interview, Baxter claimed he had blacked out the evening Robin went missing and had problems remembering what happened. When a detective asked Baxter if he had anything to

5

do with Robin's murder, he responded, "Well I might have done it and I might not have. I blacked out." *Id.* at 125. Baxter also said, "If I did do it, I want the electric chair." *Id.*

In July of 1990, Baxter's half-brother, Robert Hardesty, reported to police that a man at a nearby bar claimed to have been involved in Robin's death. Upon questioning by the police, Hardesty admitted that he had made the story up so that Baxter "would have some hope[.]" *Id.* at 182.

Shortly after the murder, Baxter moved out of the Troy Street residence he had shared with Robin, and Charles McMillian moved into the residence in August 1990. Shortly after moving in, McMillian was attempting to place a chair in a closet when he accidentally dented the wallboard inside the closet. When he did so, he was able to see inside the wall, and he discovered an aluminum bar hidden between the wall joists. McMillian removed the bar and gave it to his friend, Robert Waldridge, who was a machinist, so Waldridge could use it to make a tool for him. Additionally, one night in early September 1990, a man McMillian later identified as Baxter came to the Troy Street house and asked for help starting his stalled car. McMillian went with the man, expecting to help jumpstart the car, but when they pushed the car, it started right up. When McMillian returned to the house, he learned from his girlfriend that someone had tried to break in while he was gone.

On October 16, 1990, Robin's mother, June Eurton, approached the police with a photograph of Baxter in the Troy Street residence. The photograph depicted the aluminum bar Baxter had nicknamed "the Enforcer" or "the Equalizer" leaning against a wall in the background. The next day, Major Keith Whitlow went to the former Baxter residence to look

6

for the bar. Major Whitlow showed McMillian the photograph, and McMillian told him that he had found the bar and given it to Waldridge. Later that day, Major Whitlow met with Waldridge and recovered the bar, which Waldridge had not yet altered in any way. Major Whitlow also recovered a small towel and a glove from inside the wall where McMillian had found the bar. The bar, towel, and glove were all submitted to the Indiana State Police Laboratory for testing. The laboratory report described the bar as a "solid aluminum rod" with a diameter of one and three-quarter inches and a length of thirty-six inches. *Id.* at 64. No blood or hair was found on the bar. Baxter's DNA was found on the glove.

In November of 1990, Robin's body was exhumed and a second autopsy was performed to further study the injuries to her skull. The police reported the results of their investigation to the Floyd County Prosecutor's office 1990, but no charges were filed at that time and the case went cold.

Sometime after Robin's death, Baxter gave Robin's friend, Robin Payton, a ride home from work. Baxter had been drinking and was driving erratically, and he began crying and said "You know I'd never hurt you. You know I'd never hurt you on purpose. You know I love you." *Id.* at 375. Payton believed that Baxter was speaking to Robin. Payton found Baxter's behavior disturbing, so she got out of the car and walked the rest of the way home.

Sometime around November 1992, Baxter visited Spring and Charlie at their home. Baxter was intoxicated, and at some point during the evening, "out of the blue," he told Spring and Charlie, "You don't know the power you feel when you take someone's life, until you've actually done it." *Id.* at 356. Charlie then accused Baxter of killing Robin, and

Baxter lunged at Charlie and choked him into unconsciousness. Charlie regained consciousness when Spring and her children struggled to pull Baxter off of him, but Charlie was not able to escape Baxter's grasp until he struck Baxter across the face with a drinking glass.

In 2011, Detective Sergeant Perry Parsons of the New Albany Police Department reopened the investigation into Robin's death. During the course of the investigation, Sergeant Parsons interviewed Spring, Charlie, Carlisle, and Payton, none of whom were interviewed during the 1990 investigation. Sergeant Parsons also re-interviewed Edelen. During the course of the investigation, it was discovered that the aluminum bar recovered from Waldridge's possession had been lost. Evidence records showed that the bar was last in the possession of the medical examiner who conducted Robin's second autopsy in 1990; the medical examiner had subsequently passed away, and the bar was never located. As a result of Detective Parsons's investigation, the State charged Baxter with Robin's murder on February 2, 2012.

Baxter's three-day jury trial commenced on July 11, 2012. Over Baxter's objection, the trial court admitted into evidence a demonstrative replica of the lost aluminum bar. At the conclusion of the evidence, Baxter was found guilty as charged. The trial court held a sentencing hearing on August 31, 2012, and sentenced Baxter to an executed term of fifty-five years in the Department of Correction. Baxter now appeals.

First, Baxter argues that the trial court abused its discretion in allowing Edelen to testify, over his objection, that Robin said Baxter "had been acting worse than she'[d] ever seen him" and was going to kill her. *Id.* at 446. The decision to admit or exclude evidence lies within the trial court's sound discretion. *Filice v. State*, 886 N.E.2d 24 (Ind. Ct. App. 2008), *trans. denied*. An abuse of discretion occurs when the trial court's decision is against the logic and effect of the facts and circumstances before it. *Dixon v. State*, 967 N.E.2d 1090 (Ind. Ct. App. 2012). We will not reverse absent a showing of manifest abuse of discretion resulting in the denial of a fair trial. *Johnson v. State*, 831 N.E.2d 163 (Ind. Ct. App. 2005), *trans. denied*. Additionally, "[t]he Court of Appeals may affirm the trial court's ruling if it is sustainable on any legal basis in the record, even though it was not the reason enunciated by the trial court." *Scott v. State*, 883 N.E.2d 147, 152 (Ind. Ct. App. 2008).

Baxter argues that Edelen's testimony was inadmissible hearsay. Hearsay is an out-of-court statement offered in court to prove the truth of the matter asserted. *Boatner v. State*, 934 N.E.2d 184 (Ind. Ct. App. 2010). As a general rule, hearsay is inadmissible unless the statement falls within one of the established hearsay exceptions. *Yamobi v. State*, 672 N.E.2d 1344 (Ind. 1996). The State disputes that the statement was hearsay, arguing that the statement was not admitted to prove the truth of the matter asserted, but was instead offered to explain why Edelen was concerned for Robin's safety. The State also argues that even if the statement was hearsay, it was nevertheless admissible because it falls within the exceptions for present-sense impressions and excited utterances. Assuming *arguendo* that

the statement was hearsay, we conclude that the trial court did not abuse its discretion in admitting it because it was an excited utterance.

> In order for a hearsay statement to be admitted as an excited utterance, three elements must be present: (1) a startling event has occurred; (2) a statement was made by a declarant while under the stress of excitement caused by the event; and (3) the statement relates to the event. This is not a mechanical test, and the admissibility of an allegedly excited utterance turns on whether the statement was inherently reliable because the witness was under the stress of the event and unlikely to make deliberate falsifications. "The heart of the inquiry is whether the declarant was incapable of thoughtful reflection." Although the amount of time that has passed is not dispositive, a statement that is made long after the startling event is usually less likely to be an excited utterance.

*Boatner v. State*, 934 N.E.2d at 186 (citations omitted).

The State argues that the test for admission as an excited utterance has been satisfied because a startling event had occurred—by Baxter's own admission, Robin and Baxter had been in a heated argument—and that Robin's statements related to that event and were made while still under the stress and excitement caused by the event. Baxter responds that the statement does not amount to an excited utterance because Edelen "testified that she did not get the impression that Robin was in any present danger when she uttered the statement." *Reply Brief* at 5.

As an initial matter, we note that Edelen testified that she was concerned for Robin's safety; in fact, she testified that she feared Robin would "end up dead." *Transcript* at 430. To the extent some of Edelen's testimony might suggest that she did not believe Robin was in danger, Baxter's argument is a request for us to consider conflicting evidence in a light unfavorable to the trial court's ruling, which we will not do on appeal. In any event, whether

10

Edelen believed Robin was in danger is irrelevant to the question of whether Robin's statements were admissible as excited utterances. The evidence presented indicates that Baxter and Robin had been in a heated confrontation, which was apparently ongoing at the time Robin spoke to Edelen. Robin's statement that Baxter "had been acting worse than she'[d] ever seen him" and was going to kill her clearly related to that confrontation. *Id.* at 446. Additionally, Edelen testified that when Robin spoke to her, she was "very upset," "sounded like she had been crying," and spoke in a whisper. *Transcript* at 419. These facts support a conclusion that Robin was still under the stress and excitement of the confrontation when she made the statements. We therefore conclude that Robin's statements satisfy the requirements to be admissible as an excited utterance. Consequently, the trial court did not abuse its discretion in admitting them.

Moreover, even assuming that the statements were improperly admitted, reversal is not warranted because the error was harmless. "The improper admission of evidence is harmless error when the conviction is supported by substantial independent evidence of guilt as to satisfy the reviewing court that there is no substantial likelihood the questioned evidence contributed to the conviction." *Sisson v. State*, 985 N.E.2d 1, 15 (Ind. Ct. App. 2012) (quoting *Martin v. State*, 779 N.E.2d 1235, 1242 (Ind. Ct. App. 2002), *trans. denied*), *trans. denied*. Here, the evidence admitted against Baxter, although circumstantial, was overwhelming. Baxter admitted to police that he had gotten into a very heated argument with Robin the night of her murder, and that he had gone so far as to break out a window in anger. On the same night, after receiving a phone call from Robin, Edelen feared for Robin's safety.

11

Also on that night, Robin appeared at Perry's house, bloodied and visibly shaking, and told him she was going to try to call her mother because she was afraid. While Robin was talking to Perry, Baxter was sitting outside the house in a lawn chair. This was apparently the last time Robin was seen alive.

By the next morning, Robin was missing, and Carlisle noticed a new hole in the wall. Later that day, Spring and Charlie noticed a fresh repair job to the wall. When Carlisle returned later, she noticed that the wall had been repaired and that the aluminum bar Baxter kept as a weapon was missing. Additionally, when Spring and Charlie went to look for Robin near the railroad tracks, Baxter insisted that they stay away from the area because he had already looked there. Days later, Robin's body was found in the Ohio River; she had died of non-accidental blunt-force trauma to the back of the head.

After Baxter moved out of the Troy Street residence, McMillian moved in and found the aluminum bar hidden inside the wall. Additionally, one night after moving out, Baxter came to the Troy Street residence to ask for McMillian's help with a stalled vehicle. When McMillian came to his aid, the vehicle started easily. While McMillian was away, however, someone tried to break into the house.

Additionally, Baxter made a number of incriminating statements following Robin's death. In an interview with the police, when asked if he had anything to do with Robin's murder, Baxter responded, "Well I might have done it and I might not have. I blacked out." *Transcript* at 125. A couple years after the murder, while visiting with Spring and Charlie, Baxter stated, "You don't know the power you feel when you take someone's life, until

12

you've actually done it." *Id.* at 356. When Charlie accused Baxter of killing Robin, Baxter responded by attacking Charlie and choking him into unconsciousness. On another occasion, an intoxicated Baxter began crying and told Payton, "You know I'd never hurt you. You know I'd never hurt you on purpose. You know I love you." *Id.* at 375. The exchange made Payton uncomfortable and she felt as though he was talking to his deceased wife, Robin.

In light of the substantial independent evidence of Baxter's guilt, we cannot say that there is a substantial likelihood that Edelen's testimony concerning Robin's statements on the night of her murder contributed to Baxter's conviction. Accordingly, any error in the admission of those statements was harmless.

2.

Next, Baxter argues that the trial court abused its discretion in admitting the replica of the aluminum bar alleged to be the murder weapon as a demonstrative exhibit. "Demonstrative evidence is evidence offered for purposes of illustration and clarification." *Dunlap v. State*, 761 N.E.2d 837, 842 (Ind. 2002) (quoting *Wise v. State*, 719 N.E.2d 1192, 1196 (Ind. 1999)). "To be admissible, the evidence need only be sufficiently explanatory or illustrative of relevant testimony to be of potential help to the trier of fact." *Wise v. State*, 719 N.E.2d at 1196.

Baxter argues that the replica was inadmissible because it was not relevant. Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ind. Evidence Rule 401. More specifically, Baxter argues that the

replica's relevance was conditional; that is, he asserts that the replica of the bar would become relevant only if the State presented evidence that the original bar was the murder weapon.

Issues of conditional relevance are governed by Indiana Rule of Evidence 104(b), which provides that "[w]hen the relevancy of evidence depends upon the fulfillment of a condition of fact, the Court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition." "Whether Rule 104(b) should result in the exclusion of evidence depends upon whether 'the fact upon which the evidence depends is too speculative' at the time a party seeks introduction of the evidence." *Duvall v. State*, 978 N.E.2d 417, 427 (Ind. Ct. App. 2012) (quoting *Granger v. State*, 946 N.E.2d 1209, 1216 (Ind. Ct. App. 2011)), *trans. denied*. Substantially similar duplicates may be admissible as demonstrative evidence. *Meisberger v. State*, 640 N.E.2d 716 (Ind. Ct. App. 1994).

On appeal, Baxter does not dispute that the replica was substantially similar to the original bar. Instead, Baxter argues that the State failed to link the original bar with Robin's murder and, consequently, the test for the admissibility of conditionally relevant evidence was not satisfied. We disagree.

The State presented evidence that Robin died of blunt force trauma to the back of her head, and the medical examiner concluded that the injuries were not the result of an accidental fall. The State also presented evidence that Baxter owned an aluminum bar that he nicknamed "the Enforcer" or "the Equalizer," which he kept readily accessible in the home

14

he shared with Robin. Within a few days of Robin's murder, however, the bar had disappeared. The bar was eventually found inside a wall in the closet of the residence, along with a glove containing Baxter's DNA. Additionally, evidence indicated that Baxter was involved in an attempt to break into the residence after he moved out; it can be inferred from that evidence that Baxter wanted to retrieve the bar from its hiding place within the wall.

This evidence, while circumstantial, gives rise to an inference that the original bar was used in the murder. Baxter's arguments that the original bar was not conclusively determined to be the murder weapon go to the weight to be accorded the demonstrative exhibit, not its admissibility. *See Taylor v. State*, 587 N.E.2d 1293, 1300 (Ind. 1992) (holding that "if evidence only inconclusively connects the defendant with the crime, this goes to the weight, not to the admissibility, of the evidence"). The trial court did not abuse its discretion in admitting the replica as a demonstrative exhibit.

Moreover, any error in the admission of the replica was harmless. The replica was admitted solely to demonstrate the characteristics of the original aluminum bar. Photographs of the original bar were admitted into evidence, and several witnesses testified concerning its size and properties. Accordingly, the replica itself was merely cumulative of other evidence concerning the original aluminum bar. *See Bryant v. State*, 802 N.E.2d 486 (Ind. Ct. App. 2004) (noting that erroneously admitted evidence that is merely cumulative of other evidence in the record is harmless and not grounds for reversal), *trans. denied*. Any error in the admission of the replica was therefore harmless.

3.

Next, Baxter argues that the State's failure to preserve the original aluminum bar violated due process principles. To determine whether the State's failure to preserve evidence has violated a defendant's due process rights, we must first determine whether the evidence is materially exculpatory or merely potentially useful. *State v. Durrett*, 923 N.E.2d 449 (Ind. Ct. App. 2010). Evidence is materially exculpatory if it possesses exculpatory value that was apparent before it was destroyed and the defendant is unable to obtain comparable evidence by other reasonable means. *Id.* "Evidence is exculpatory if it is '[c]learing or tending to clear from alleged fault or guilt; excusing.'" *Terry v. State*, 857 N.E.2d 396, 406 (Ind. Ct. App. 2006) (quoting *Land v. State*, 802 N.E.2d 45, 49 (Ind. Ct. App. 2004), *trans. denied*), *trans. denied*. On the other hand, evidence is considered merely "potentially useful" if "no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Id.* (quoting *Arizona v. Youngblood*, 488 U.S. 51, 57 (1988).

The State's failure to preserve materially exculpatory evidence violates due process regardless of whether the State acted in good or bad faith. *State v. Durrett*, 923 N.E.2d 449. If, however, the evidence is merely potentially useful, the State's failure to preserve it does not constitute a denial of due process unless the defendant can show bad faith on the part of the State. *Land v. State*, 802 N.E.2d 45 (Ind. Ct. App. 2004), *trans. denied*. Bad faith is not simply bad judgment or negligence; rather, it "implies the conscious doing of wrong because

16

of dishonest purpose or moral obliquity." *Id.* at 49 (quoting *Wade v. State*, 718 N.E.2d 1162, 1166 (Ind. Ct. App. 1999), *trans. denied*).

A defendant is not required to prove conclusively that the lost evidence is exculpatory; there must, however, be some indication that the evidence was in fact exculpatory. *Terry v. State*, 857 N.E.2d 396. "If the defendant fails to demonstrate the evidence's exculpatory nature, we will not simply 'assume that the destroyed evidence contained exculpatory material when the record is devoid of such indication.'" *Id.* at 407 (quoting *Blanchard v. State*, 802 N.E.2d 14, 26 (Ind. Ct. App. 2004)).

As an initial matter, we address Baxter's argument that "this Court should conclude that when the State chooses to replicate lost evidence, the nature of which is not immediately clear, that such lost evidence is materially exculpatory." *Appellant's Brief* at 26. Baxter directs us to no authority supporting this novel argument.[3] Moreover, we believe that the test requiring the exculpatory value of the evidence to be apparent before its loss or destruction prohibits the type of hindsight analysis Baxter advocates. We reject Baxter's request that we

---

[3] *Roberson v. State*, 766 N.E.2d 1185 (Ind. Ct. App. 2002), the sole case Baxter cites in support of this argument, provides no support for his position. That case did not involve a replica of lost evidence; it is therefore puzzling that Baxter suggests that it stands for the proposition that where the State introduces a replica of lost evidence, it is assumed that the lost evidence is materially exculpatory.

Additionally, Baxter's attempts to analogize *Roberson v. State* are unconvincing. In that case, the defendant was charged with possessing material capable of causing bodily injury by an inmate based on his possession while incarcerated of a device fashioned from a wooden tongue depressor split down the middle, wrapped together with tape or paper, and sharpened to a slight point on one end. Prior to filing the charges, however, the device was discarded. In concluding that the device was materially exculpatory, this court noted that the precise condition of the device as altered was critical to both the State's case and Roberson's defense. This court reasoned that Roberson could not obtain comparable evidence because the device was unique and could not be replicated. The court also reasoned that because the device was made from items Roberson was allowed to have in his cell, there was at least some indication that the device possessed exculpatory value that was apparent to the State prior to its destruction.

17

assume the bar was materially exculpatory, and now proceed to analyze that question under the framework of the existing law.

Baxter has not established that the bar was materially exculpatory. Baxter simply argues that it is not entirely clear whether the bar was "substantial enough" to have been used as the murder weapon. *Appellant's Brief* at 28. In other words, Baxter argues that the bar could have been "subjected to tests, the results of which might have exonerated the defendant." *Terry v. State*, 857 N.E.2d at 406 (quoting *Arizona v. Youngblood*, 488 U.S. at 57). Moreover, Baxter has not presented any evidence that the bar could not have been used as a weapon, and the State presented ample evidence concerning the properties of the bar. This evidence supports a conclusion that the bar could have been used as a bludgeon, and was in fact intended to be used in that manner. Indeed, Carlisle testified that Baxter told her he kept the bar "for protection." *Transcript* at 488. Baxter simply asks us to disregard the State's evidence and engage in speculation concerning the properties of the bar, which we will not do. *See Terry v. State*, 857 N.E.2d at 406 (declining to speculate as what the results of testing of the lost evidence might have been). For all of these reasons, the bar was, at most, potentially useful. Consequently, its loss amounts to a due process violation only if the State acted in bad faith. Because Baxter makes no argument that the State acted in bad faith, he has not established a due process violation.

---

Suffice it to say, *Roberson* was a difficult case arising out of peculiar factual circumstances—circumstances which are quite different than those presented here. For this reason, we do not find that case controlling or even particularly persuasive here.

4.

Finally, Baxter argues that the trial court violated state and federal *ex post facto* prohibitions by relying upon the current statute setting forth the sentencing range for murder as opposed to the statute in effect at the time of the murder. We agree.

It is well settled that the sentencing statute in effect at the time a crime is committed governs the sentence for that crime. *Gutermuth v. State*, 868 N.E.2d 427 (Ind. 2007). Moreover, "the constitutional prohibitions against *ex post facto* criminal sanctions require that criminal proceedings be governed by the statutory provision in effect at the time of the offense." *Settle v. State*, 709 N.E.2d 34, 35 (Ind. Ct. App. 1999). At the time Baxter murdered Robin, the applicable sentencing statute provided, in relevant part, that "[a] person who commits murder shall be imprisoned for a fixed term of forty (40) years, with not more than twenty (20) years added for aggravating circumstances or not more than ten (10) years subtracted for mitigating circumstances." Ind. Code Ann. § 35-50-2-3 (West 1990). The current sentencing statute provides that "[a] person who commits murder shall be imprisoned for a fixed term of between forty-five (45) and sixty-five (65) years, with the advisory sentence being fifty-five (55) years." I.C. § 35-50-2-3 (West, Westlaw current through P.L. 171 with effective dates through May 7, 2013).

It is appears from our review of the sentencing transcript and sentencing order that the trial court, as well as the State and defense, were operating under the assumption that the current sentencing statute was applicable in this case. At Baxter's sentencing hearing, the State argued that "under the statute . . . there's a forty-five (45) to sixty-five (65) . . . year

19

window, a minimum, a maximum for murder[.]" *Transcript* at 601. The State went on to ask

the trial court to impose the "maximum sentence" of sixty-five years. *Id.* at 604. Defense

counsel stated that "the minimum sentence of forty-five (45) years would be appropriate in

this case [and] that would be our request[.]" *Id.* at 606-07. In its written sentencing order,

the trial court noted that the State recommended "the maximum executed sentence of Sixty-

five years" and that Baxter asked for "the minimum executed sentence of Forty-five years[.]"

*Appellant's Appendix* at 212. In its sentencing order, the trial court gave the following

explanation of its imposition of Baxter's fifty-five-year sentence:

> The Court imposes a sentence based upon the following reasons: the defendant's previous criminal history is considered as an aggravating factor by the court because it is reflective of his character over a significant portion of his life for disregard of the law and authority. Beginning at the age of sixteen as a juvenile and continuing into adulthood, the defendant was arrested thirteen times and accumulated multiple alcohol/substance related misdemeanor convictions. Plus, [with respect to] the last of these offenses, the defendant was terminated from probation unsuccessfully. The multiple arrests of defendant and his noncompliance on probation indicate his lack of respect for authority and that these interactions with law enforcement and court officials have not deterred criminal activity during his life. As a significant mitigating factor, the court finds that the defendant has lacked any criminal history since 2001.
> THE COURT FINDS THAT THE AGGRAVATING FACTOR BALANCES OUT FAIRLY EVENLY AGAINST THE MITIGATING FACTOR.

*Id.* at 213 (emphasis in original).

Thus, it appears that the State and the defense both believed that the current

sentencing statute for murder, with its forty-five-year minimum and sixty-five-year

maximum, was applicable in this case, and that the trial court understandably accepted these

assertions at face value.[4] Moreover, based on the trial court's conclusion that the aggravating and mitigating factor balanced evenly, it appears that the court believed the fifty-five-year sentence it was imposing was the current fifty-five-year advisory sentence as opposed to an enhanced sentence under the previous, applicable version of the statute. As best we can discern from the record, it does not appear that either party did anything to correct the trial court's misunderstanding prior to its entry of the written sentencing order.

Nevertheless, the State argues that no error occurred because the fifty-five-year sentence Baxter ultimately received fell within the thirty- to sixty-year sentencing range set forth in the statute in effect at the time Baxter committed the offense. The State notes that the sentence exceeds the statutory presumptive sentence prevailing at that time, but argues that the circumstances of the offense support the imposition of an enhanced sentence. Moreover, the State argues that the trial court's finding that the mitigating and aggravating factors were relatively balanced "was not an explicit finding that their respective weights were equal." *Appellee's Brief* at 30.

We need not address whether a fifty-five-year sentence imposed under the correct sentencing statute would be upheld on appeal. It suffices for our purposes to note that the record in this case makes it clear that the trial court applied the incorrect sentencing statute, and the possibility that the same sentence might have been imposed had the court applied the correct statute does not cure the error. Nevertheless, we decline Baxter's request for this

---

[4] Nevertheless, Baxter has not waived his right to challenge the *ex post facto* application of the amendment to the sentencing statute for murder because "the *ex post facto* application of a criminal statute is fundamental error[.]" *Settle v. State*, 709 N.E.2d at 35 n.3.

21

court to revise his sentence to the forty-year presumptive term under the applicable sentencing statute. Although we note that the trial court found that the aggravating and mitigating circumstances were in balance, we cannot say with confidence that its ultimate sentencing decision was not influenced by its misunderstanding concerning the applicable sentencing range. Accordingly, we reverse Baxter's sentence and remand to the trial court with instructions to resentence Baxter under the correct sentencing statute.

Judgment affirmed in part, reversed in part, and remanded with instructions.

ROBB, C.J., and CRONE, J., concur.